1  Joel E. Elkins (SBN 256020)
   jelkins@weisslawllp.com
2  **WEISS LAW**
   611 Wilshire Blvd., Suite 808
3  Los Angeles, CA 90017
   Telephone: 310/208-2800
4  Facsimile: 310/209-2348

5  *Attorney for Plaintiff*

6  [additional counsel appears on signature page]

7

8                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
9                         **SAN JOSE DIVISION**

10

11  MINDY LEHMANN, Derivatively on Behalf of          Case No.:
    NETFLIX, INC.,
12
                                    Plaintiff,
13                                                     **VERIFIED STOCKHOLDER**
                                                       **DERIVATIVE COMPLAINT**
14          vs.

15  RICHARD N. BARTON, RODOLPHE BELMER,                **JURY DEMAND**
    MATHIAS DOPFNER, TIMOTHY M. HALEY, REED
16  HASTINGS, JAY C. HOAG, LESLIE KILGORE,
    STRIVE MASIYIWA, ANN MATHER, TED
17  SARANDOS, BRADFORD L. SMITH, and ANNE M.
    SWEENEY,
18
                                    Defendants,
19
            and
20
    NETFLIX, INC.,
21
                                    Nominal Defendant.
22

23          Plaintiff Mindy Lehmann, by her undersigned attorneys, respectfully submits this Verified

24  Stockholder Derivative Complaint. Plaintiff makes these allegations upon personal knowledge with

25  respect to Plaintiff and, as to all other matters, upon information and belief developed from the

26  investigation and analysis by Plaintiff's counsel, including a review of publicly available information,

27

28

                                                    1

filings by Netflix, Inc. ("Netflix" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and other information regarding Netflix. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Netflix against the members of its Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary duty and violations of the federal securities laws, which resulted in material damage to the Company and irreparably harmed its reputation.

2.     Netflix is one of the world's leading streaming entertainment services with millions of paid subscribers.  Netflix offers a wide range of TV series, documentaries, feature films and mobile games across a wide variety of genres and languages, including original content. Subscribers can watch these programs, ad-free, on any internet-connected screen at their leisure.

3.     The market in which Netflix operates is extremely competitive and one of the keys to success is the ability to acquire and retain paid subscribers.

4.     Throughout 2021, the Company represented in press releases, earnings calls, and its public filings that its business was healthy, and that the Company's acquisition and retention of paid subscribers was strong.  Blaming any slowing in subscriber growth on the pandemic and its ongoing impact, the Company and the Individual Defendants sidestepped critical issues regarding emerging competitors, short-sighted price increases, and rampant account sharing, covering over the fact that the Company had inadequate internal controls in place.

5.     On January 20, 2022, the Company reported weak subscriber growth for the fourth quarter of 2021, missing previous guidance by 200,000 subscribers. The Company admitted to "slightly over-forecast[ing] paid net adds" in the fourth quarter of 2021, but Defendant Hastings reassured investors and securities analysts that "execution is steady and getting better." Defendant Sarandos confirmed that the business fundamentals were "solid." The Company also issued guidance

for the second quarter of 2022, which forecast expected growth of 2.5 million subscribers, down from the previous year's numbers of four million additional paid subscribers for the same period.

6.     On April 19, 2022, the Company reported that instead of gaining 2.5 million subscribers it had ***lost 200,000 subscribers***, again missing its previous guidance. Netflix further disclosed other disappointing financial numbers, including revenue growth of only 9.8%  for the first quarter of 2022 compared to the previous quarter's 16% growth, resulting in a more than $100 million loss in quarterly earnings from the same period a year earlier.

7.     On the news of the negative financial numbers, Netflix's stock dropped sharply the next day, losing over 35% of its value.

8.     In the wake of the precipitous stock drop, securities class action lawsuits were filed by aggrieved investors against the Company, certain of the Individual Defendants, and two of the Company's officers. As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself, its officers, and directors.

9.     In the second quarter of 2022, Netflix reported an even more significant loss of 970,000 subscribers. In 2022, Netflix's stock has dropped more than 60%.

10.     The Individual Defendants ignored red flags from the news media and financial analysts warnings of Netflix's shrinking share of the streaming market, due to new competitors, account-sharing issues, and cancellations based on increased subscription pricing. The Individual Defendants owed and owe to Netflix and its stockholders the highest fiduciary duties. However, the Individual Defendants failed to fulfill these duties.

11.     As a result of the Individual Defendants' breaches of fiduciary duty, Netflix has sustained substantial damages and irreparable injury to its reputation. Through this action, Plaintiff seeks to recover for the Company its damages and remediate the control weaknesses that plague Netflix.

12.     Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this action,

Netflix will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.     JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges claims arising under the laws of the United States.  The claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States.

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District where Netflix maintains its principal executive offices pursuant to 28 U.S.C. § 1391 because a substantial portion of the wrongs took place in this District, Defendants transact business in this District, and Defendants' actions have had an effect in this District.

## III.    PARTIES

### A.     Plaintiff

18.     Plaintiff Mindy Lehmann purchased Netflix stock in August 2018 and has held Netflix stock continuously since that time. As such, Plaintiff was a shareholder at the time of the transactions complained of herein. Plaintiff is a citizen of New York.

**B.     Defendants**

    **1.     Nominal Defendant Netflix, Inc.**

19.     Defendant Netflix is a company duly incorporated under the laws of the State of Delaware with its principle executive offices located at 100 Winchester Circle, Los Gatos, California 95032. Netflix's common stock trades on the Nasdaq Stock Market under the symbol "NFLX."

    **2.     Individual Defendants**

        **a.     Defendant Barton**

20.     Defendant Richard N. Barton ("Barton") is a Netflix director since 2002 and a member of the Audit Committee. On April 22, 2022, the Company filed a Proxy Statement with the SEC (the "2022 Proxy Statement"). According to the 2022 Proxy Statement, Barton beneficially owns 33,399 Netflix common shares and received $350,675 in option awards for serving as a Netflix director in 2021.

21.     Barton co-founded Zillow Group, Inc. ("Zillow") in 2005 and is Zillow's Chief Executive Officer ("CEO"). From 2005 until 2018, Barton worked as a venture partner at Benchmark Capital ("Benchmark"), a venture capital fund. Barton founded Expedia Group, Inc. ("Expedia") within the Microsoft Corporation ("Microsoft") in 1996, where he was president and CEO from 1999 until 2003, and he successfully spun Expedia out as a public company in 1999. Barton, served for on the board of Nextdoor Holdings, Inc. ("Nextdoor") for many years and was one of its earliest investors.

22.     Barton is a citizen of Washington.

        **b.     Defendant Belmer**

23.     Defendant Rodolphe Belmer ("Belmer") is a Netflix director since 2018 and a member of the Compensation Committee. According to the 2022 Proxy Statement, Belmer beneficially owns 6,002 Netflix common shares and received $350,437 in option awards for serving as a Netflix director in 2021.

24.     Belmer is a citizen of France.

### c.     Defendant Dopfner

25.     Defendant Mathias Dopfner ("Dopfner") is a Netflix director since 2018 and a member of the Compensation Committee. According to the 2022 Proxy Statement, Belmer beneficially owns 6,603 Netflix common shares and received $350,415 in option awards for serving as a Netflix director in 2021.

26.     Dopfner is a citizen of either Germany or Florida.

### d.     Defendant Haley

27.     Defendant Timothy M. Haley ("Haley") is a Netflix director since 1998 and is the Chair of the Compensation Committee. According to the 2022 Proxy Statement, Haley beneficially owns 39,286 Netflix common shares and received $350,675 in option awards for serving as a Netflix director in 2021.

28.     Haley founded a venture capital firm, Redpoint Ventures ("Redpoint"), and has served as its Managing Director since 1999. Haley also serves as the Managing Director of another venture capital firm, Institutional Venture Partners ("Institutional Venture"), since 1998. Haley currently serves on the board of directors of several companies including 2U, Inc. ("2U"), and Zuora, Inc ("Zuora").

29.     Haley is a citizen of California.

### e.     Defendant Hastings

30.     Defendant Reed Hastings is a Netflix director since 1997. Hastings co-founded Netflix in 1997 and is its co-CEO, President, and Chairman of the Board. According to the 2022 Proxy Statement, Hastings beneficially owns 7,611,449 Netflix common shares, giving him 1.7% of the Company's voting control, and received the following compensation in 2021:

| YEAR | SALARY | OPTION AWARDS | OTHER COMPENSATION | TOTAL |
|------|--------|---------------|--------------------|-------|
| 2021 | $650,000 | $39,731,118 | $442,607[1] | $40,823,725 |

[1]     This figure represents the expense for the personal use of company aircraft.

31.     Hastings previously served on the board of Facebook, Inc. ("Facebook") from 2011 until 2019 and Microsoft from 2007 until 2012.

32.     Hastings is a citizen of California.

**f.     Defendant Hoag**

33.     Defendant Jay C. Hoag ("Hoag") is a Netflix director since 1999 and the Chair of the Nominating and Governance Committee. According to the 2022 Proxy Statement, Hoag beneficially owns 1,714,723 Netflix common shares and received $350,675 in option awards for serving as a Netflix director in 2021.

34.     Hoag co-founded  Technology Crossover Ventures ("TCV"), a venture capital firm in 1995 and serves as a General Partner. Netflix is a TCV portfolio company. Hoag is also a Zillow director since 2005, another TCV portfolio company. Hoag also served on the board of Expedia, another TCV portfolio company, from 2000 until 2003.

35.     Hoag is a citizen of California.

**g.     Defendant Kilgore**

36.     Defendant Leslie Kilgore ("Kilgore") is a Netflix director since 2012 and is a member of the Audit Committee. Kilgore served as Netflix's chief marketing officer from 2000 until 2012. According to the 2022 Proxy Statement, Kilgore beneficially owns 48,361 Netflix common shares and received $350,415 in option awards for serving as a Netflix director in 2021. Kilgore is on the board of Nextdoor since November 2021.

37.     Kilgore is a citizen of either California or Ohio.

**h.     Defendant Masiyiwa**

38.     Defendant Strive Masiyiwa ("Masiyiwa") is a Netflix director since 2020 and is a member of the Nominating and Governance Committee. According to the 2022 Proxy Statement, Masiyiwa beneficially owns 1,924 Netflix common shares and received $350,415 in option awards for serving as a Netflix director in 2021.

39.     Masiyiwa is a citizen of South Africa.

#### i.    Defendant Mather

40.    Defendant Ann Mather ("Mather") is a Netflix director since 2010 and Chair of the Audit Committee. According to the 2022 Proxy Statement,  Mather beneficially owns 17,517 Netflix common shares and received $350,675 in option awards for serving as a Netflix director in 2021.

41.    Mather is a citizen of either Hawaii or California.

#### j.    Defendant Sarandos

42.    Defendant Ted Sarandos ("Sarandos") is a Netflix director since 2020. Sarandos is co-CEO and Chief Content Officer at Netflix. According to the 2022 Proxy Statement, Sarandos beneficially owns 572,994 Netflix common shares and received the following compensation in 2021:

| YEAR | SALARY | OPTION AWARDS | OTHER COMPENSATION | TOTAL |
|------|--------|---------------|--------------------|-------|
| 2021 | $20,000,000 | $17,119,501 | $1,112,663[2] | $38,232,164 |

43.    Sarandos is a trustee of the American Film Institute.

44.    Sarandos is a citizen of California.

#### k.    Defendant Smith

45.    Defendant Bradford L. Smith ("Smith") is a Netflix director since 2015 and a member of the Nominating and Governance Committee. Smith joined Microsoft in 1993 and has served as President and Vice Chair of Microsoft since 2021. According to the 2022 Proxy Statement, Smith beneficially owns 31,831 Netflix common shares and received $350,675 in option awards for serving as a Netflix director in 2021.

46.    Smith is a citizen of Washington.

#### l.    Defendant Sweeney

47.    Defendant Anne M. Sweeney ("Sweeney") is a Netflix director since 2015 and a member of the Compensation Committee. According to the 2022 Proxy Statement, Sweeny

---

[2]    This figure includes the expense for the personal use of company aircraft, the Company's matching contribution under the 401 (k) plan, car services, and residential security costs to protect Sarandos.

beneficially owns 10,165 Netflix common shares and received $350,675 in option awards for serving as a Netflix director in 2021.

48.    Sweeney is a trustee of the American Film Institute.

49.    Sweeney is a citizen of California.

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES

50.    By reason of their positions as officers or directors of Netflix and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe to Netflix and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Netflix in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Netflix and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

51.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Netflix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.    As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on NASDAQ, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Netflix's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Netflix's management, policies, and internal controls.

53.    At all times relevant hereto, the Individual Defendants were the agents of each other and Netflix and were always acting within the course and scope of such agency.

54.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Netflix.

A.     **Additional Duties Under The Code Of Ethics**

55.     The Netflix Board adopted a Code of Ethics for "its directors, officers and other employees."

56.     The Code of Ethics emphasizes the need "to act and perform…duties ethically and honestly and with the utmost integrity" and stresses that "honest conduct is considered to be conduct that is free from fraud or deception."  Further, "[e]thical conduct includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships."

57.     In a section titled "Conflicts of Interest," the Code of Ethics discusses the issue of "using or attempting to use [a] position with the Company to obtain improper personal benefits." The Code of Ethics states that "[a]ny Netflix Party who is aware of a conflict of interest, or is concerned that a conflict might develop, is required to discuss the matter with a higher level of management or the General Counsel promptly."  Senior Financial Officers "may, in addition to speaking with the General Counsel, also discuss the matter with the Audit Committee."

58.     In a section titled "Compliance," the Code of Ethics states: "[T]he Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Netflix Party to adhere to the standards and restrictions imposed by those laws, rules and regulations, and in particular, those relating to accounting and auditing matters." If any "Netflix Party….is unsure whether a situation violates any applicable law, rule, regulation or Company policy [they] should discuss the situation with the General Counsel."

59.     The Code of Ethics details the importance of "Internal Reporting:"

Netflix Parties shall take all appropriate action to stop any known misconduct by fellow Netflix Parties that violate this Code. To this end, Netflix Parties shall report any known or suspected misconduct to the General Counsel or, in the case of misconduct by a Senior Financial Officer, also to the Chair of the Company's Audit Committee. In addition, Netflix Parties are encouraged to use the Company's confidential internal reporting system to report breaches of this Code.

**B.      Additional Duties Of The Members Of The Audit Committee**

60.      The members of the Company's Audit Committee have additional duties outlined in the Audit Committee Charter, including requirements that its members:

- Providing oversight and monitoring of the activities of Company management, including without limitation, the chief financial officer and principal accounting officer and controller, the Company's internal audit function and the independent auditors with respect to the Company's financial reporting and compliance process, as well as oversight and monitoring of the Company's internal audit function generally;

- Reviewing on a continuing basis the adequacy and effectiveness of the Company's system of internal controls over financial reporting as well as the Company's disclosure controls and procedures, and the Company's risk assessment and risk management policies related to financial and legal risk, including cybersecurity risk;

- Reviewing before release the unaudited quarterly and audited annual operating results in the Company's quarterly and annual earnings releases;

- Reviewing with management, before release, the audited financial statements and Management's Discussion and Analysis of Financial Condition and Results of Operations included in the Company's Annual Report on Form 10-K, and recommending to the Board following such review, if appropriate, that the audited financial statements be included in such Annual Report on Form 10-K;

- Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls, auditing matters or fraudulent financial reporting and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting, internal controls or auditing matters;

- Providing oversight and review of the Company's asset management policies, including without limitation an annual review of the Company's investment policies and performance for cash and short-term investments;

- Reviewing and approving related party transactions for potential conflicts of interests; and

- If necessary, instituting special investigation(s) and, as appropriate, hiring special counsel or experts to assist in such investigation(s).

**C.      Additional Duties Of The Members Of The
         Nominating And Governance Committee**

61.      The members of the Company's Nominating and Governance Committee have additional duties outlined in the Nominating and Governance Committee Charter, including requirements that its members:

- Review from time to time and report to the Board on general corporate governance matters.

- Recommend to the Board, as appropriate, policies, procedures and practices regarding corporate governance for the Company as may be consistent with any applicable laws, regulations and listing standards.

- Periodically review and evaluate, as appropriate, the performance of the Board and the Committee.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background

62.   Netflix is one of the world's leading entertainment services offering paid members access to TV series, documentaries, feature films and mobile games across a wide variety of genres and languages. The Company has three reportable segments: (1) Domestic Streaming; (2) International Streaming; and (3) Domestic DVD.[3]

63.   In April 1998, Netflix started renting out DVDs by mail. A year later, Netflix changed its pay-for-use model into a subscription model. Nearly a decade later, Netflix changed its business to a streaming service, which changed the way millions of people spend their free time.[4] In its public filings, Netflix describes itself as "a pioneer in the delivery of streaming entertainment."

64.   Netflix was one of the early disruptors in the entertainment field, offering its paid subscribers access to its "bingeable, no-advertising revolution."[5] However, with competition from companies such as Hulu and Amazon Prime and new entrants into the streaming marketplace like Disney+ and HBO Max touting their own compelling services, Netflix is fighting a hard-fought battle to keep its paid subscribers. As the Company notes in multiple public filings: "our revenues are primarily derived from monthly membership fees for services related to streaming content to our members."[6]

---

[3]      Netflix's Domestic DVD segment provides a DVD-by-mail service.

[4]      Marjolein Oomen, *Netflix: How a DVD Rental Company Changed the Way We Spend Our Free Time,* BMI, https://www.businessmodelsinc.com/exponential-business-model/netflix/ (last visited on May 23, 2022).

[5]      Nicole Sperling, Netflix *Loses Subscribers for First Time in 10 Years, The New York Times,* April 19, 2022, https://www.nytimes.com/2022/04/19/business/netflix-earnings-q1.html.

[6]      All emphasis herein is added unless otherwise stated.

65.     To retain subscribers, Netflix offers a wide range of programming options, including some of the Company's own content and gaming. As the Company emphasizes in its public filings, "[w]e are continuously improving our members' experience by expanding our content with a focus on a programming mix of content that delights our members and attracts new members. In addition, we are continuously enhancing our user interface and extending our streaming service to more internet-connected screens." As of December 2021, Netflix had over 200 million paying subscriber households, in at least 190 countries, and had over 15,000 different titles which could be streamed globally.

**B.     The Individual Defendants Knew The Material Risks Regarding Netflix's Core Operations**

66.     On January 28, 2021, the Company filed its Annual Report on Form 10-K with the SEC for the period ended December 31, 2020 (the "2020 10-K"), which was signed by all the Individual Defendants except for Defendant Sweeney. Defendants Hastings and Sarandos executed certifications under the Sarbanes-Oxley Act of 2002 ("SOX") that the 2020 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

67.     In the 2020 10-K, the Company disclosed the risks relating to attracting and retaining its paid subscribers:

> If our efforts to attract and retain members are not successful, our business will be adversely affected.
>
> We have experienced significant membership growth over the past several years. Our ability to continue to attract members will depend in part on our ability to consistently provide our members with compelling content choices, effectively market our service, as well as provide a quality experience for selecting and viewing TV series, documentaries and feature films. Furthermore, the relative service levels, content offerings, pricing and related features of competitors to our service may adversely impact our ability to attract and retain memberships….If consumers do not perceive our service offering to be of value, including if we introduce new or adjust existing features, adjust pricing or service offerings, or change the mix of content in a manner

that is not favorably received by them, we may not be able to attract and retain members.

68.     The Company disclosed potential subscriber loss due to price adjustments:

**We may, from time to time, adjust our membership pricing or our pricing model itself, which may not be well-received by consumers, and which may result in existing members canceling our service or fewer new members joining our service**…. If our efforts to satisfy our existing members are not successful, we may not be able to attract members, and as a result, our ability to maintain and/or grow our business will be adversely affected….We must continually add new memberships both to replace canceled memberships and to grow our business beyond our current membership base.

69.     The 2020 10-K further disclosed the risks of competition for existing memberships:

If we are unable to successfully compete with current and new competitors in both retaining our existing memberships and attracting new memberships, our business will be adversely affected. Further, if excessive numbers of members cancel our service, we may be required to incur significantly higher marketing expenditures than we currently anticipate to replace these members with new members.

70.     The 2020 10-K disclosed the risks of operating in an "intensely competitive" market which is "subject to rapid change," and the risks of the vast number of competitive forces fighting for the Company's subscribers including, "other entertainment video providers, such as multichannel video programming distributors…, streaming entertainment providers (including those that provide pirated content), video gaming providers, and more broadly against other sources of entertainment that our members could choose in their moments of free time." Netflix  also competes "against streaming entertainment providers and content producers in obtaining content…both for licensed content and for original content projects."

71.     In the 2020 10-K, the Company described getting a subscriber to choose its streaming service as "winning moments of truth," and in attempting to win these moments of truth with its members, Netflix was "continually improving [its] service, including both our technology and our content, which is increasingly exclusive and curated, and includes our original programming."

72.     The 2020 10-K further disclosed the risks from multiple users sharing a single account, stating that while the Company permits multiple users within the same household to share a single account for non-commercial uses, "if multi-household usage is abused or if our efforts to restrict

14

multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted."

**C.   Netflix And The Individual Defendants' Representations Regarding Company Growth**

73.    On January 19, 2021, Netflix filed with the SEC a Current Report on Form 8-K attaching a letter to shareholders that same day announcing that despite the pandemic, Netflix had increased revenue higher than forecasted and increased its paid memberships by over 23% for the fourth quarter of 2020.

74.    The letter to shareholders reported these positive financial results:

With 8.5m paid net additions in Q4, we crossed the 200m paid memberships mark. For the full year, we added a record 37m paid memberships, achieved $25 billion in annual revenue (+24% year over year) and grew operating profit 76% to $4.6 billion.

Average paid streaming memberships increased 23% year over year in Q4, while average revenue per membership1 was flat year over year both on a reported and foreign exchange (F/X) neutral basis. Revenue was 1% higher than our guidance forecast, as paid net adds exceeded our 6.0m projection by 2.5m. Operating margin of 14.4% (a 600bps increase from Q4'19) also came in above our guidance, due to higher-than-expected revenue.

75.    The Company also reported that the thirty-seven million more paid members in 2020 represented a 31% year over year increase from 2019.

76.    On a call with investors and financial analysts that same day, Spencer Neuman ("Neuman"), Netflix's Chief Financial Officer ("CFO"), attributed the growth to "what COVID has done for us is it has accelerated that big shift from linear to streaming entertainment." Neuman touted that "the long-term growth trajectory is at least as strong as ever. There's just more short-term noise and uncertainty right now, but still very strong underlying growth metrics…."

77.    Neuman assured that the Company was primed to retain and acquire subscribers:

[V]iewing is up in every region of the world. It's kind of returned from those peak COVID levels, but it's up year-over-year in all regions. Retention is better than it was a year ago. Acquisition is strong. So the underlying metrics are strong in the business….

78.    On April 21, 2021, Netflix filed with the SEC a Current Report on Form 8-K attaching a letter sent to shareholders that same day announcing its first quarter 2021 financial results. The

accompanying shareholder letter reported that Netflix continued to grow revenue and explained away the Company's failure to meet previous guidance for paid memberships for the first quarter, blaming it on a slowing in the unusual interest in streaming during the pandemic and "a lighter content slate in the first half of this year, due to Covid-19 production delays."

79.     The Company further reassured that any downward trend was for the "short-term" based on "uncertainty from Covid-19" and affirmed that "[w]e continue to anticipate a strong second half with the return of new seasons of some of our biggest hits and an exciting film lineup."

80.     In a conference call with financial analysts that same day, Neuman also placed the blame for the failure to meet subscriber guidance on the pandemic:

> But look, so in terms of Q1 performance, it really boils down to COVID frankly. As you know, the extraordinary events of COVID have had a big impact on the world, continue to have a big impact on the world. And for us, at a minimum, it creates just some ***short-term*** choppiness in some of the business trends that we see in our business.
>
> ***
>
> So the business remains healthy and that's because the long-term drivers, this big transition from linear to streaming entertainment and that remains as healthy as ever, but you do see a little kind of noise in the near term, ***but a lot of long-term clarity.***

81.     On the call, Neuman brushed off the issue of increased competition in the streaming space remarking that "[i]t's intensely competitive, but it always has been. We've been competing with Amazon Prime for 13 years, with Hulu for 14 years." Neuman confirmed that "there's no real change that we can detect in the competitive environment."

82.     Defendant Hastings reassured that the Company would "get back to much steadier state in the back half of the year."

83.     On July 20, 2021, Netflix filed with the SEC a Current Report on Form 8-K attaching a letter sent to shareholders that same day announcing its second quarter 2021 financial results. The shareholder letter reported that revenue increased by 19% in the second quarter and Netflix finished the quarter with over "209 million paid memberships," slightly ahead of its forecast. The letter again contributed any slowing in membership growth to the effects of the pandemic: "COVID has created some lumpiness in our membership growth (higher growth in 2020, slower growth this year), which is working its way through."

84.     On October 19, 2021, Netflix filed with the SEC a Current Report on Form 8-K attaching a letter sent to shareholders that same day announcing positive third quarter 2021 financial results. The shareholder letter reported that Netflix had increased revenue by 16% year over year and significantly increased its number of paid subscribers.

85.     In the shareholder letter, the Company stated it had under-forecast its paid net member additions for the third quarter: "we under-forecasted paid net adds for the quarter (4.4m actual vs. our 3.5m projection), while ending paid memberships of 214m was within 0.4% of our forecast."

86.     The Company also emphasized the expected growth for the fourth quarter of 2021:

> We're very excited to finish the year with what we expect to be our strongest Q4 content offering yet, which shows up as bigger content expense and lower operating margins sequentially.
>
> ***
>
> **For Q4'21, we forecast paid net adds of 8.5m, consistent with Q4'20 paid net additions. For the full year 2021, we forecast an operating margin of 20% or slightly better. This means that Q4'21 operating margin will be approximately 6.5% compared with 14% in Q4'20**. The year over year decline in operating margin is due mostly to our backloaded big content release schedule in this Q4, which will result in a roughly 19% year over year increase in content amortization for Q4'21 (compared with ~8% growth year to date).

87.     On the same day, Netflix held a conference call for analysts and investors relating to the release of the positive third quarter numbers. On the call, Defendant Sarandos represented that the Company was poised for further growth:

> We've had what I think is a tremendous quarter, delivering on films and TV shows that people really love and love to talk about. And if we keep doing that well, that's what fuels our growth.
>
> We are focused on delivering value every time one of our members tries to figure out what they want to watch next, every time they figure out how much they want to spend for -- to entertain themselves, we want to be in that equation. And we do that, I think, if we focus on that, the way we have for films, the way we have for series and the way we will for games, that we're going to be delivering hours and hours and hours of entertainment and hours and hours of joy for our members. **And we're midway through October. And in Q4, still to come, we have our biggest film bets we've ever made.**

88.     Neumann, Netflix's CFO, stated that "throughout the quarter, the business remained healthy as it had been throughout the year with churn at low levels, down prior to the comparable periods, both in 2020 and two years ago, pre-COVID in 2019. **So retention was very healthy**."

89.     Neumann represented that the Company was ready for unprecedented content growth which would drive "acquisition, retention, more viewing, delivering more joy to our members:"

> I don't think there's a precise number there . . .other than that we have the ability, we believe, to grow across all those content categories for the foreseeable future, some more than others, right, in terms of pace of growth. So some of those are just earlier and higher growth, but we're growing across all those content categories, and we don't see a ceiling at least for the foreseeable future.

90.     Neumann also emphasized the Company's guidance for the year of 8.5 million paid net member additions. Neuman confirmed the Company's ability to grow, remarking that "the secular growth trends are pretty strong, so long as we continue to improve our service."

91.     Defendant Hastings downplayed the threat of competitors and praised Netflix's content, stating that "[c]ompetition, obviously, that's a factor, but the amount of scale of content and entertainment that we have and the way we're set up… is incredible."

92.     In its Quarterly Report on Form 10-Q filed with the SEC on October 21, 2021, for the period ending September 30, 2021 (the "3Q21 10-Q"), Netflix affirmed the previously reported positive financial results.[7]

93.     The 3Q21 10-Q, reported an increase of revenue in the third quarter by 16% year over year to $7.5 billion, while operating income rose to $1.8 billion or 33% vs. the prior year's third quarter. Paid memberships increased by 9% from the previous year's third quarter, going from 195 million paid members to 214 million. Paid net member additions increased to 4.4 million from the 2.2 million in the previous year's third quarter.

**D.     Netflix and The Individual Defendants Report
        Subscriber And Revenue Loss**

94.     On January 20, 2022, Netflix filed with the SEC a Current Report on Form 8-K attaching a shareholder letter from that day announcing the Company's financial results for the fourth

---

[7]     The 3Q21 10-Q was signed by Defendant Hastings. Defendants Hastings and Sarandos executed certifications under SOX that the 3Q21 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

quarter of 2021. In the letter, Netflix reported that it had "slightly over-forecasted paid net adds in Q4," with only 8.3 million paid net subscribers "compared to the 8.5m paid net adds in both the year ago quarter and our beginning of quarter projection." The Company had added significantly less paid subscribers in 2021 compared to the previous year, with only 18 million added paid memberships versus 37 million in 2020.

95.     Despite the weak subscriber growth, Netflix issued increased subscriber guidance for the first quarter of 2022:

> For Q1'22, we forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter. Our guidance reflects a more back-end weighted content slate in Q1'22 (for example, *Bridgerton* S2 and our new original film *The Adam Project* will both be launching in March). In addition, while retention and engagement remain healthy, acquisition growth has not yet re-accelerated to pre-Covid levels. We think this may be due to several factors including the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM.

96.     In a call with financial analysts and investors that same day, CFO Neuman continued to reassure that "the business was healthy. **Retention was strong**. Churn was down. Viewing was up. But on the margin, we just -- we didn't grow acquisition quite as fast as we would have liked to see on our large subscriber base."

97.     Neuman again laid the blame on "overall COVID overhang that's still happening after two years of a global pandemic that we're still unfortunately not fully out of, some macroeconomic strain in some parts of the world, like Latin America, in particular."

98.     Defendant Hastings commented that the Company's "execution is steady and getting better, "and emphasized the lingering pandemic impact, stating that "we're just like staying calm and trying to figure out, again, the COVID has introduced so much noise. It just wants us to give it some pause as we work on everything we've always worked on."

99.     Defendant Sarandos also attributed the waning subscriber growth to the fact that the pandemic "created a lot of bumpiness certainly and not steady linear growth, which makes it a little tougher to predict, **but all the fundamentals of the business are pretty solid.**"

100.     However, despite these reassurances, the Company's stock price fell $110.75, or nearly 22%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.

101.   On April 19, 2022, after the market closed, Netflix reported that it lost **200,000 subscribers** during the first quarter of 2022, compared to the previous guidance expecting the Company to add 2.5 million net subscribers. In a shareholder letter attached to a Current Report on Form 8-K filed with the SEC on April 19, 2022, Netflix reported "considerably" slower revenue growth of only 9.8% for the quarter, compared to the previous quarter's 16% growth, resulting in a more than $100 million loss in quarterly earnings from the same period a year earlier:

> Our revenue growth has slowed considerably as our results and forecast below show…. [O]ur relatively high household penetration - when including the large number of households sharing accounts - combined with competition, is creating revenue growth headwinds. The big COVID boost to streaming obscured the picture until recently. While we work to reaccelerate our revenue growth - through improvements to our service and more effective monetization of multi-household sharing - we'll be holding our operating margin at around 20%.

102.   The shareholder letter reported the negative subscriber growth and retention in contrast to the previous positive guidance for the first quarter:

> **Paid net additions were -0.2m compared against our guidance forecast of 2.5m and 4.0m in the same quarter a year ago**….The main challenge for membership growth is continued soft acquisition across all regions. **Retention was also slightly lower relative to our guidance forecast**….
>
> Paid net additions in LATAM totaled -0.4m; similar to recent quarters, we believe a combination of forces including macroeconomic weakness and our price changes (F/X neutral ARM grew 20% year over year) were a drag on our membership growth. UCAN paid net adds of -0.6M was largely the result of our price change which is tracking in-line with our expectations and is significantly revenue positive.
>
> **As a reminder, the quarterly guidance we provide is our actual internal forecast at the time we report. For Q2'22, we forecast paid net additions of -2.0m vs. +1.5m in the year ago quarter. Our forecast assumes our current trends persist (such as slow acquisition and the near term impact of price changes) plus typical seasonality (Q2 paid net adds are usually less than Q1 paid net adds). We project revenue to grow approximately 10% year over year in Q2, assuming roughly a mid-to-high single digit year over year increase in ARM on a F/X neutral basis.** We still target a 19%-20% operating margin for the full year 2022, assuming no material swings in F/X rates from when we set this goal in January of 2022.

103.   The shareholder letter expounded on the down revenue and the loss of subscribers, noting four factors, including issues of account sharing with over 100 million households and the entrance of new entrants into the streaming market:

> [I]n addition to our 222m paying households, we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region.
>
> ***
>
> [O]ver the last three years, as traditional entertainment companies realized streaming is the future, many new streaming services have also launched. While our US television viewing share, for example, has been steady to up according to Nielsen, we want to grow that share faster. Higher view share is an indicator of higher satisfaction, which supports higher retention and revenue.

104.    In its Quarterly Report on Form 10-Q filed with the SEC on April 21, 2022, for the period ending March 31, 2022 (the "1Q22 10-Q"), Netflix affirmed the previously reported disappointing financial results.[8]

105.    Following the news of the loss in subscribers and disappointing financial results, the Company's share price fell $122.42, or over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume.

106.    A recent survey revealed that subscribers who have been Netflix for more than three years accounted for thirteen percent of cancellations in the first quarter of 2022.[9] The data also showed that overall cancellations hit 3.6 million people last quarter, an increase from the 2.5 million cancellations in the past five quarters. In contrast, a relatively new competitor of Netflix, Disney Plus, added eight million new subscribers in the first quarter.

107.    Over the next two months, Netflix cut 450 jobs following the drop in subscribers.[10]

108.    On July 19, 2022, the Company filed with the SEC a Current Report on Form 8-K attaching a shareholder letter released that same day announcing the financial results for the second quarter of 2022. The shareholder letter reported a loss of 970,000 subscribers for the quarter.

---

[8]     The 1Q22 10-Q was signed by Defendant Hastings. Defendants Hastings and Sarandos executed certifications under SOX that the 1Q22 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

[9]     Emma Roth, *Survey Shows Netflix is Losing More Long-Term Subscribers*, *The Verge*, May 18, 2022, https://www.theverge.com/2022/5/18/23125424/netflix-losing-long-term-subscribers-streaming.

[10]    Jennifer Maas, *et al*., *Netflix Begins Second Round of Layoffs, 300 Positions Cut Variety*, June 23, 2022, https://variety.com/2022/tv/news/netflix-layoffs-fired-jobs-lost-1235301553/.

109.    In 2022, Netflix's stock has dropped more than 60%.

**E.      Netflix Is Sued In Securities Class Action Lawsuits**

110.    In the wake of the spiraling stock price caused by Netflix's disclosures regarding its failure to attract and retain subscribers and falling revenue, a securities class action lawsuit was filed against Netflix and certain of its directors and officers. On May 3, 2022, *Pirani v. Netflix, Inc., et al.*, No. 4:22-cv-02672-JST (N.D. Cal.), was filed seeking damages on behalf of a class of persons who purchased or otherwise acquired Netflix common stock or call options, or sold put options, between October 19, 2021 and April 19, 2022, inclusive. Pirani charged the Company, Defendants Hastings and Sarandos and CFO Neumann with violations of Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act.

111.    Pirani alleges that the defendants failed to disclose to investors that: (1) Netflix was exhibiting slower acquisition growth due to, among other things, account sharing by customers and increased competition from other streaming services; (2) the Company was experiencing difficulties retaining customers; (3) as a result of the foregoing, the Company was losing subscribers on a net basis; (4) as a result, the Company's financial results were being adversely affected; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

112.    On May 31, 2022, *Cleveland Bakers and Teamsters Pension Fund v. Netflix, Inc., et al.*, No. 4:22-cv-03164-JST (N.D. Cal.), was filed, seeking damages on behalf of a class of persons and entities that purchased or otherwise acquired Netflix common stock between January 19, 2021, and April 19, 2022, inclusive. The lawsuit charged the Company, Defendants Hastings and Sarandos, CFO Neumann, and Gregory Peters, the Company's Chief Operating Officer ("COO") and Chief Product Officer, with violations of Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act. The lawsuit alleges that the defendants failed to disclose to investors that: (1) account sharing by customers and increased competition from other streaming services were becoming

significant headwinds; (2) the Company was experiencing difficulties retaining customers; (3) as a result of the foregoing, the Company's growth was decelerating; (4) as a result of the foregoing, the Company's financial results were being adversely affected; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

**F.    Netflix's False And Misleading Proxy Statement**

113.    On April 22, 2022, the Company filed its 2022 Proxy Statement with the SEC soliciting shareholder votes to, among other things, elect Defendants Haley, Kilgore, Masiyiwa, and Mather to the Board. The 2022 Proxy Statement was issued by order of the Board and was signed by Hoag.

114.    In his introductory remarks, Defendant Hoag represented that the Board was committed to proper corporate governance practices, stating that "[l]ast fall, we held a virtual ESG Investor Day where . . . our Board and management team engaged with a number of our shareholders. [W]e had meaningful and candid discussions about our corporate governance practices. This shareholder feedback continues to inform our regular review of our corporate governance practices[.]"

115.    The 2022 Proxy Statement reiterated the representation regarding strong corporate governance practices:

> Our corporate governance structure is built against this backdrop. Governance, in this context, means finding the right balance of rights and responsibilities among shareholders, the Board, and management, and ensuring that there are appropriate checks and balances in place. With the rapid evolution of technology and the changing media landscape, we are continually adjusting our service to meet the dynamic needs and desires of our consumers. Our governance structure is built to help us to do that.

116.    The 2022 Proxy Statement represented that the Board was exercising proper risk oversight:

> The Board's role in our risk oversight process includes reviewing and discussing with members of management areas of material risk to the Company, including strategic, operational, financial and legal risks. The Board as a whole primarily deals with matters related to strategic and operational risk and oversees the Company's ESG efforts. Each of the committees oversee various ESG matters, depending on the specific issues, with the Nominating and Governance Committee serving as the

primary committee responsible for ESG matters. The Nominating and Governance Committee also manages risks associated with Board independence and corporate governance. The Audit Committee deals with matters of financial and legal risk, including cybersecurity risk. The Compensation Committee addresses risks related to compensation and other human capital management issues, such as diversity and inclusion efforts. Committees report to the full Board regarding their respective considerations and actions.

117. The 2020 Proxy Statement also represented that the Audit Committee was responsible for overseeing and evaluating the Company's internal controls.

118. The 2022 Proxy Statement was materially false and misleading because the Individual Defendants failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

## G. The Individual Defendants Ignored Red Flags

119. Despite warnings from the news media and financial analysts that subscriber growth was stagnating due to account sharing and fierce competition from emerging streaming services, the Individual Defendants failed to investigate and take action, allowing the Company to remain with inadequate internal controls.

120. In an April 20, 2021 article,[11] *The New York Times* cautioned that Netflix's dominance in the streaming market was ending. The article pointed to the fact that the Company's competitors were cutting "into Netflix's share of viewers' attention."

121. The article cited numbers from data firm Parrot Analytics demonstrating that demand for Netflix original content was dropping compared to similar offerings from other new streaming

---

[11] Edmund Lee, *Netflix's Dominance Starts to Slow as Rivals Gain, The New York Times,* https://www.nytimes.com/2021/04/20/business/media/netflix-subscribers-earnings.html.

services. Parrot Analytics reported that Netflix's share of total demand — a measure of the popularity of its shows — was slightly above 50 percent for the first three months of the year, compared with 54 percent a year ago and 65 percent in the first quarter of 2019.

122.    The article emphasized Netflix's failure to meet the guidance for paid memberships for the first quarter of 2021, adding only four million new subscribers versus the six million expected, a fact that the Company had chalked up to Covid-19 production delays and a drop from the intense interest in streaming during the pandemic.

123.    *The New York* Times article also noted that Netflix raised prices the previous October, increasing its standard plan by a dollar to $14 a month, and was struggling with issues of account sharing.

124.    Another article in May 2021 from Internet Bull Reporting,[12] an investor relations services company, focused on the drop in subscribers in the first quarter of 2021. The article stressed that Netflix was expecting to gain only one million new users in the following quarter, which would be the lowest number of additional quarterly members in the Company's history.

125.    The article noted that Netflix's letter to shareholders at the end of the first quarter of 2021 had failed to mention anything about the severe ongoing issue of account sharing. According to a survey by Magid quoted in the article, nearly **33%** of all Netflix users share their password with at least one person.

126.    The concerns voiced in the news media were seconded in financial analyst reports. Even before the report of the missed subscriber guidance for the first quarter, on April 17, 2021, JPMorgan noted that it believed that investors' "overall sentiment around NFLX remains muted given COVID-related pull-forward driving Y/Y declines in net adds, ***along [with] increased competition & price increase concerns***." JPMorgan, in a follow-up report on April 21, 2021, warned that "on the

---

[12]    Will O'Halloran, *Netflix Q1 Earnings Report Worries Investors,* May 9, 2021, https://internetbullreport.com/netflix-q1-earnings-report-worries-investors/.

margin there will likely be increased concerns on the importance of hit content, competition, & overall visibility."

127.    Despite the prevalence of account sharing concerns, Netflix and the Individual Defendants ignored the red flags, and  failed to act aggressively to stop the sharing until recently. In the April 2021 earnings call, an analyst asked Defendant Hastings if the Company was "tightening the screws" on account sharing, based on a recent security measure noted by some users. Hastings replied that it was only a random test, and that the Company would "test many things, but we would never roll something out that feels like turning the screws."

128.    However, in the beginning of 2022, faced with the falling subscriber numbers, Netflix was forced to implement a pilot program to clamp down on the practice of account sharing in an attempt to bail water after a disastrous first quarter earnings report. However, as a recent *Fortune* article[13] notes, it seems that Netflix's actions were "too little and too late."  The new pilot program is ineffective, with Netflix "failing to enforce changes and users upset with higher charges canceling their subscription." Lou Basenese, founder and chief analyst at media analytics firm Disruptive Tech Research, quoted extensively in the article, feels that there is no good way out for Netflix at this point: "There's no reasonable way to enforce the crackdown without losing more customers, [t]his is an issue they should have addressed long ago before consumers got accustomed to password sharing."

## VI.    DEMAND FUTILITY AND DERIVATIVE ALLEGATIONS

129.    Plaintiff brings this action derivatively and for the benefit of Netflix to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Netflix, gross mismanagement, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

130.    Netflix is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

---

[13]    Tristan Bove, *Netflix has Warned about a Crackdown on Password Sharing. It's Looking Like an Empty Threat, Fortune*, June 1, 2022, https://fortune.com/2022/06/01/netflix-password-sharing-plan-latin-america-analyst/.

131.    Plaintiff is, and has been at all relevant times, a stockholder of Netflix and was a stockholder of the Company at the time of the transactions alleged herein. Plaintiff will adequately and fairly represent the interests of Netflix in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

132.    Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused. The Board is neither disinterested nor independent.

**A.      Demand Upon Defendant Barton Is Excused**

133.    Barton received $350,675 in compensation in the form of option awards for his service as a director in 2021. Barton earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix [14] is $294,000, about 17% less than Barton.

134.    Defendant Barton is a Netflix director since 2002. Barton will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Barton holds 33,399 shares of Netflix common shares. If Barton acknowledged that he, Netflix, or others engaged in misconduct, his investment in Netflix would be substantially devalued and his lucrative position jeopardized. Further, if Barton acknowledged that executives at Netflix had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

135.    Barton has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner. For example, Barton co-founded Zillow in 2005 and is Zillow's CEO. Defendant Hoag has been a Zillow director since

---

[14]    The FW Cook survey defines a large cap company as one with a market capitalization of $10 billion or greater.

2005. In addition, Technology Crossover Ventures ("TCV"), a venture capital firm which Hoag co-founded in 1995 and currently serves as a General Partner, owns significant equity in Zillow as part of its portfolio, as well as Netflix.  Hoag is designated as a member of TCV's Zillow investment team.[15]  Another TCV portfolio company is Expedia, which Barton co-founded and served as the company's President and CEO from 1999 until 2003.  Hoag also served on the board of Expedia, alongside Barton, from 2000 until 2003.

136.   Barton sat on the board of Nextdoor Holdings, Inc.[16] for many years and was one of its earliest investors. From 2005 until 2018, Barton worked as a venture partner at Benchmark Capital, a venture capital fund, which has invested millions of dollars into Nextdoor and led an $18.6 million Nextdoor investment round in 2012. Bill Gurley ("Gurley"), a current General Partner at Benchmark,[17] worked alongside Barton for thirteen years. Gurley was also one of the earliest investors in Nextdoor and sits on its board since 2008. Defendant Kilgore is on the board of Nextdoor since November 2021.

137.   Defendant Haley founded a venture capital firm, Redpoint Ventures, a large investor in Nextdoor, and has served as its Managing Director since 1999. Redpoint Ventures led a $110 million Series D investing round in Nextdoor in 2015, which Benchmark also joined. Redpoint currently owns 4,281,549 Nextdoor Class B common shares, with 1.36% voting power in the company. Haley also serves as the Managing Director of another venture capital firm, Institutional Venture Partners, since 1998. Institutional Venture invested in Nextdoor in 2019.

138.   Barton authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

---

[15]   TCV, Companies, https://www.tcv.com/companies/zillow/ (last visited July 27, 2022).

[16]   Nextdoor, is the parent company of Nextdoor.com, which operates a hyperlocal social networking app for neighborhoods.

[17]   Benchmark currently owns 52,649,930 Nextdoor Class B common shares, amounting to 17% voting power in the company. Gurley controls the voting power over those shares, along with others at Benchmark. Gurley directly owns 773,748 Nextdoor Class B common shares.

139.    Barton, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

140.    As a member of the Audit Committee, Barton had duties regarding oversight of the risks facing the Company and Netflix's compliance with relevant laws, rules, and regulations. Barton utterly failed to perform these essential duties.

141.    Barton is neither disinterested nor independent. Any demand upon Defendant Barton is futile and, thus, excused.

**B.    Demand Upon Defendant Belmer Is Excused**

142.    Belmer received $350,437 in compensation in the form of option awards for his service as a director in 2021. Belmer earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix is $294,000, about 16% less than Belmer.

143.    Defendant Belmer is a Netflix director since 2018. Belmer will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Belmer holds 6,002 shares of Netflix common shares. If Belmer acknowledged that he, Netflix, or others engaged in misconduct, his investment in Netflix would be substantially devalued and his lucrative position jeopardized. Further, if Belmer acknowledged that executives at Netflix had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

144.    Belmer authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

145.    Belmer, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

146.    Belmer is neither disinterested nor independent. Any demand upon Defendant Belmer is futile and, thus, excused.

**C.    Demand Upon Defendant Dopfner Is Excused**

147.    Dopfner received $350,415 in compensation in the form of option awards for his service as a director in 2021. Dopfner earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix is $294,000, about 16% less than Dopfner.

148.    Defendant Dopfner is a Netflix director since 2018. Dopfner will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Dopfner holds 6,603 shares of Netflix common shares. If Dopfner acknowledged that he, Netflix, or others engaged in misconduct, his investment in Netflix would be substantially devalued and his lucrative position jeopardized. Further, if Dopfner acknowledged that executives at Netflix had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

149.    Dopfner authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

150.    Dopfner, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

151.    Dopfner is neither disinterested nor independent. Any demand upon Defendant Dopfner is futile and, thus, excused.

**D.    Demand Upon Defendant Haley Is Excused**

152.    Haley received $350,675 in compensation in the form of option awards for his service as a director in 2021. Haley earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix [18] is $294,000, about 17% less than Haley.

153.    Defendant Haley is a Netflix director since 1998. Haley will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Haley holds 39,286 shares of Netflix common shares. If Haley acknowledged that he, Netflix, or others engaged in misconduct, his investment in Netflix would be substantially devalued and his lucrative position jeopardized. Further, if Haley acknowledged that executives at Netflix had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

---

[18]     The FW Cook survey defines a large cap company as one with a market capitalization of $10 billion or greater.

154.    Haley has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner. For example, Defendant Haley founded a venture capital firm, Redpoint Ventures, a large investor in Nextdoor, and has served as its Managing Director since 1999. Redpoint currently owns 4,281,549 Nextdoor Class B common shares, with 1.36% voting power in the company. Haley also serves as the Managing Director of another venture capital firm, Institutional Venture Partners, since 1998. Institutional Venture invested in Nextdoor in 2019. Barton, who served as a venture partner at Benchmark from 2005 until 2018, sat on the board of Nextdoor for many years and was one of its earliest investors. Benchmark has invested millions of dollars into Nextdoor, led an $18.6 million investment round in 2012, and joined Redpoint in a $110 million Series D investing round in Nextdoor in 2015. Gurley, a current General Partner at Benchmark, worked alongside Barton for thirteen years. Gurley was also one of the earliest investors in Nextdoor[19] and sits on its board since 2008.   Defendant Kilgore is on the board of Nextdoor since November 2021.

155.    Haley is on the board of Zuora since October 2010. Benchmark, where Defendant Barton worked recently as a venture partner, invested heavily in Zuora over the years. Haley joined the board of Zuora in conjunction with a Series C investing round led by Redpoint Ventures, in which Benchmark participated.

156.    Haley is on the board of 2U. Another member of the 2U board, Gregory Peters, COO and Chief Product Officer at Netflix,  is named as a defendant in one of the pending securities class actions. As such, Haley is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

157.    Haley authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

---

[19]    Benchmark currently owns 52,649,930 Nextdoor Class B common shares, amounting to 17% voting power in the company. Gurley controls the voting power over those shares, along with others at Benchmark. Gurley directly owns 773,748 Nextdoor Class B common shares.

158.     Haley benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Netflix Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

159.     Haley, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

160.     Haley is neither disinterested nor independent. Any demand upon Defendant Haley is futile and, thus, excused.

### E.     Demand Upon Defendant Hastings Is Excused

161.     As Netflix admits in its public filings, Hastings is the co-founder of Netflix, co-CEO, President, and Chairman of the Board, and a Netflix director since 1997, and therefore is not independent. Indeed, Netflix's 2022 Proxy Statement does not list Hastings as an independent director.

162.     As he is an employee of Netflix, the Company provides Defendant Hastings with his principal occupation from which he receives substantial compensation, including $40,823,725 in 2021 alone. Thus, Hastings could not consider a demand for action that might require him to sue the directors who control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

163.     Hastings will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Hastings beneficially owns 7,611,449 Netflix common shares, giving him 1.7% of the Company's voting control. If Hastings acknowledged that he, Netflix, or others engaged in misconduct, his investment in Netflix would be substantially devalued and his

1    lucrative position jeopardized. Further, if Hastings acknowledged that executives at Netflix had

2    engaged in the wrongdoing alleged, he would be acknowledging that he, as co-CEO if the Company,

3    either knew of the wrongdoing or should have known of the wrongdoing.

4        164.    Hastings has long-standing business relationships with several of the Individual

5    Defendants which precludes him from acting in an independent and disinterested manner. Hastings

6    co-founded and launched Netflix over 24 years ago. Hastings hired his first and only head of content,

7    Sarandos, in 1999. Hastings is famous for his "Keeper Test," positing that managers should ask

8    themselves: "Which of my people, if they told me they were leaving for a similar job at a competitor

9    or peer company would I fight hard to keep?" In a recent *New York Times* article,[20] Hastings is quoted

10   saying that "Ted [Sarandos] has passed the Keeper Test for the last 22 years." Sarandos commenting

11   on his relationship with Hastings, remarked that "We hold each other. . .to a pretty high bar."[21]

12   Sarandos, when recalling his first conversation with Hastings, stated that "we connected on his love

13   of movies and the idea of how to really improve distribution."[22]

14       165.    Kilgore and Hastings became close during their time working together when Kilgore

15   was Chief Marketing Officer of Netflix. Kilgore praised Hastings' ability to understand people,

16   stating that "Reed [Hastings] really is a very rare person who is so gifted with technology but also

17   so gifted in understanding people and how to create an amazing environment for them."[23] Kilgore is

18   credited by Hastings with helping the Company survive a serious marketing fiasco, when the

19   Company raised prices and split into two division, DVD rentals (Qwikster) and streaming (Netflix),

20   resulting in the ultimate loss of 800,00 subscriptions. When Kilgore stepped down as Chief Marketing

21

22

23

24   [20]    Maureen Dowd, May 28, 2022, https://www.nytimes.com/2022/05/28/style/ted-sarandos-netflix.html.

25   [21]    *Id.*

26   [22]    Alex Ben Block, *All the President's Men, The Hollywood Reporter,* March 27, 2009, https://www.hollywoodreporter.com/business/business-news/presidents-men-81493/.

27   [23]    *Id.*

28

Officer, Hastings stated that "Leslie [Kilgore] has been instrumental in our long-term success and our recent return to solid growth."[24]

166.    Hoag and Hastings also have a close relationship as Hoag was an early investor of Netflix through TCV. According to Hoag: "Reed [Hastings] is one of the very few CEOs I would hand my checkbook to and say: 'Tell us what you're doing and please let us invest.'"[25]

167.    Hastings and Smith also have a long-standing business relationship since their time at Microsoft. Hastings served on Microsoft's Board from 2007 until 2012 and Smith joined Microsoft in 1993, served as Microsoft's General Counsel from 2002, and has served as President and Vice Chair since 2021. Hastings wrote an endorsement for Smith's book, *Tools and Weapons*: *The Promise and the Peril of the Digital Age,* which was published in 2019.

168.    Defendant Hastings is named as a defendant in the pending securities class action lawsuits. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

169.    Hastings authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

170.    Hastings as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

---

[24]    Meghan Kelley, *Netflix CMO Leslie Kilgore Leaves after 12 Years, Venture Beat,* January 20, 2012, https://venturebeat.com/2012/01/20/netflix-cmo-departs/.

[25]    Joan O'C. Hamilton, Stanford Magazine, January/February 2006, https://stanfordmag.org/contents/home-movies.

171.    Hastings is neither disinterested nor independent. Any demand upon Defendant Hastings is futile and, thus, excused.

**F.    Demand Upon Defendant Hoag Is Excused**

172.    Hoag received $350,675 in compensation in the form of option awards for his service as a director in 2021. Hoag earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix is $294,000, about 17% less than Hoag.

173.    Hoag is a Netflix director since 1999. Hoag will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Hoag holds 1,714,723 shares of Netflix common shares. If Hoag acknowledged that he, Netflix, or others engaged in misconduct, his investment in Netflix would be substantially devalued and his lucrative position jeopardized. Further, if Hoag acknowledged that executives at Netflix had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

174.    Hoag has a long-standing business relationship with Defendant Barton which precludes him from acting in an independent and disinterested manner. For example, Barton co-founded Zillow in 2005 and is Zillow's CEO. Defendant Hoag has been a Zillow director since 2005. In addition, TCV, a venture capital firm which Hoag co-founded in 1995 and currently serves as a General Partner, owns significant equity in Zillow as part of its portfolio, as well as Netflix. Hoag is designated as a member of TCV's Zillow investment team.  Another TCV portfolio company is Expedia, which Barton co-founded and served as the company's President and CEO from 1999 until 2003.  Hoag also served on the board of Expedia, alongside Barton, from 2000 until 2003.

175.   Hoag and Hastings also have a long-standing business relationship, as Hoag was an early investor of Netflix through TCV. According to Hoag: "Reed [Hastings] is one of the very few CEOs I would hand my checkbook to and say: 'Tell us what you're doing and please let us invest.'"[26]

176.   Hoag controls the 1,714,723 shares of Netflix common shares which are owned by various subsidiaries of TCV. If Hoag acknowledged that he, Netflix, or others engaged in misconduct, it would undermine Hoag and TCV's credibility and weaken their ability to attract future business.

177.   Hoag signed the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

178.   Hoag, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

179.   Hoag failed to uphold his additional obligations as Chair of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Ethics and Corporate Governance Guidelines.

180.   Hoag  is neither disinterested nor independent. Any demand upon Defendant Hoag is futile and, thus, excused.

### G.   Demand Upon Defendant Kilgore Is Excused

181.   Kilgore received $350,415 in compensation in the form of option awards for her service as a director in 2021. Kilgore earns compensation in excess of the compensation that directors

---

[26]   Joan O'C. Hamilton, Stanford Magazine, January/February 2006, https://stanfordmag.org/contents/home-movies.

earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix is $294,000, about 16% less than Kilgore.

182.    Defendant Kilgore is a Netflix director since 2012. Kilgore will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. Kilgore holds 48,361 shares of Netflix common shares. If Kilgore acknowledged that she, Netflix, or others engaged in misconduct, her investment in Netflix would be substantially devalued and her lucrative position jeopardized. Further, if Kilgore acknowledged that executives at Netflix had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company either knew of the wrongdoing or should have known of the wrongdoing.

183.    Kilgore has long-standing business relationships with several of the other directors which precludes her from acting in an independent and disinterested manner. Defendant Kilgore is on the Board of Nextdoor since November 2021. Defendant Haley founded a venture capital firm, Redpoint Ventures, a large investor in Nextdoor, and has served as its Managing Director since 1999. Redpoint currently owns 4,281,549 Nextdoor Class B common shares, with 1.36% voting power in the company. Haley also serves as the Managing Director of another venture capital firm, Institutional Venture Partners, since 1998. Institutional Venture invested in Nextdoor in 2019. Barton, who served as a venture partner at Benchmark from 2005 until 2018, sat on the board of Nextdoor for many years and was one of its earliest investors. Benchmark has invested millions of dollars into Nextdoor, led an $18.6 million Nextdoor investment round in 2012, and joined Redpoint in a $110 million Series D investing round in Nextdoor in 2015. Gurley, a current General Partner at Benchmark, worked alongside Barton for thirteen years. Gurley was also one of the earliest investors in Nextdoor and sits on its board since 2008.

184.    Kilgore served as Netflix's chief marketing officer from 2000 until 2012.  During her time as Chief Marketing Officer, Defendant Kilgore worked closely with Defendant Hastings and Defendant Sarandos. Kilgore is credited by Hastings with helping the Company survive a serious

marketing fiasco, when the Company raised prices and split into two division, DVD rentals (Qwikster) and streaming (Netflix), resulting in the ultimate loss of 800,00 subscriptions.[27] When Kilgore stepped down as Chief Marketing Officer, Hastings stated that "Leslie [Kilgore] has been instrumental in our long-term success and our recent return to solid growth."[28] Kilgore praised Hastings' ability to understand people, stating that " Reed [Hastings] really is a very rare person who is so gifted with technology but also so gifted in understanding people and how to create an amazing environment for them."[29]

185.   Kilgore authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

186.   Kilgore benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Netflix Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

187.   Kilgore, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

---

[27]   Meghan Kelley, *Netflix CMO Leslie Kilgore Leaves after 12 Years, Venture Beat,* January 20, 2012, https://venturebeat.com/2012/01/20/netflix-cmo-departs/.

[28]   *Id.*

[29]   Alex Ben Block, *All the President's Men, The Hollywood Reporter,* March 27, 2009, https://www.hollywoodreporter.com/business/business-news/presidents-men-81493/.

188.    As a member of the Audit Committee, Kilgore had duties regarding oversight of the risks facing the Company and Netflix's compliance with relevant laws, rules, and regulations. Kilgore utterly failed to perform these essential duties.

189.    Kilgore is neither disinterested nor independent. Any demand upon Defendant Kilgore is futile and, thus, excused.

**H.    Demand Upon Defendant Masiyiwa Is Excused**

190.    Masiyiwa received $350,415 in compensation in the form of option awards for his service as a director in 2021. Masiyiwa earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix is $294,000, about 16% less than Masiyiwa.

191.    Defendant Masiyiwa is a Netflix director since 2020. Masiyiwa will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Masiyiwa holds 1,924 shares of Netflix common shares. If Masiyiwa acknowledged that he, Netflix, or others engaged in misconduct, his investment in Netflix would be substantially devalued and his lucrative position jeopardized. Further, if Masiyiwa acknowledged that executives at Netflix had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

192.    Masiyiwa authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

193.    Masiyiwa benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Netflix Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

194.    Masiyiwa, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a

defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

195.    Masiyiwa is neither disinterested nor independent. Any demand upon Defendant Masiyiwa is futile and, thus, excused.

**I.    Demand Upon Defendant Mather Is Excused**

196.    Mather received $350,675 in compensation in the form of option awards for her service as a director in 2021. Mather earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix is $294,000, about 17% less than Mather.

197.    Defendant Mather is a Netflix director since 2010. Mather will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. Mather holds 17,517 shares of Netflix common shares. If Mather acknowledged that she, Netflix, or others engaged in misconduct, her investment in Netflix would be substantially devalued and her lucrative position jeopardized. Further, if Mather acknowledged that executives at Netflix had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company either knew of the wrongdoing or should have known of the wrongdoing.

198.    Mather authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

199.    Mather benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Netflix Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

200.    Mather, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all

laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

201.    As Chair of the Audit Committee, Mather had duties regarding oversight of the risks facing the Company and Netflix's compliance with relevant laws, rules, and regulations. Mather utterly failed to perform these essential duties.

202.    Mather is neither disinterested nor independent. Any demand upon Defendant Mather is futile and, thus, excused.

**J.    Demand Upon Defendant Sarandos Is Excused**

203.    As Netflix admits in its public filings, Sarandos is the co-CEO of Netflix, Chief Content Officer since 2000, and a Netflix director since 2020, and therefore is not independent. Indeed, Netflix's 2022 Proxy Statement does not list Sarandos as an independent director.

204.    As he is an employee of Netflix, the Company provides Defendant Sarandos with his principal occupation from which he receives substantial compensation, including $38,232,164 in 2021 alone. Thus, Sarandos could not consider a demand for action that might require him to sue the directors who control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

205.    Sarandos will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Sarandos beneficially owns 572,994 Netflix common shares. If Sarandos acknowledged that he, Netflix, or others engaged in misconduct, his investment in Netflix would be substantially devalued and his lucrative position jeopardized. Further, if Sarandos acknowledged that executives at Netflix had engaged in the wrongdoing alleged, he would be acknowledging that he, as co-CEO if the Company, either knew of the wrongdoing or should have known of the wrongdoing.

206.    Sarandos has long-standing business relationships with several directors which precludes him from acting in an independent and disinterested manner. For example, Hastings co-founded and launched Netflix over 24 years ago. Hastings hired his first and only head of content, Sarandos in 1999. Hastings is famous for his "Keeper Test," positing that managers should ask themselves: "Which of my people, if they told me they were leaving for a similar job at a competitor or peer company would I fight hard to keep?" In a recent *New York Times* article,[30] Hastings is quoted saying that "[Sarandos] has passed the Keeper Test for the last 22 years." Sarandos commenting on his relationship with Hastings, remarked that "We hold each other. . .to a pretty high bar."[31]

207.    Sarandos and Sweeney are trustees of the American Film Institute.

208.    Sarandos also worked alongside Defendant Kilgore when Kilgore was Chief Marketing Officer at Netflix.

209.    Sarandos authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

210.    Sarandos, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

211.    Sarandos is neither disinterested nor independent. Any demand upon Defendant Sarandos is futile and, thus, excused.

---

[30]    Maureen Dowd, May 28, 2022, https://www.nytimes.com/2022/05/28/style/ted-sarandos-netflix.html.

[31] *Id.*

**K.      Demand Upon Defendant Smith Is Excused**

212.     Smith received $350,675 in compensation in the form of option awards for his service as a director in 2021. Smith earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix [32] is $294,000, about 17% less than Smith.

213.     Defendant Smith is a Netflix director since 2015. Smith will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Smith holds 31,831 shares of Netflix common shares. If Smith acknowledged that he, Netflix, or others engaged in misconduct, his investment in Netflix would be substantially devalued and his lucrative position jeopardized. Further, if Smith acknowledged that executives at Netflix had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

214.     Smith has a long-standing business relationship with Hastings which precludes him from acting in an independent and disinterested manner . Hastings served on Microsoft's board from 2007 until 2012 and Smith joined Microsoft in 1993, served as Microsoft's General Counsel from 2002,  and has served as President and Vice Chair since 2021. Hastings wrote an endorsement for Smith's book, *Tools and Weapons: The Promise and the Peril of the Digital Age,* which was published in 2019.

215.     Smith authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

216.     Smith, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all

---

[32]     The FW Cook survey defines a large cap company as one with a market capitalization of $10 billion or greater.

laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

217.    Smith failed to uphold his additional obligations as a member of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Ethics and Corporate Governance Guidelines.

218.    Smith is neither disinterested nor independent. Any demand upon Defendant Smith is futile and, thus, excused.

**L.     Demand Upon Defendant Sweeney Is Excused**

219.    Sweeney received $350,675 in compensation in the form of option awards for her service as a director in 2021. Sweeney earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like Netflix is $294,000, about 17% less than Sweeney.

220.    Defendant Sweeney is a Netflix director since 2015. Sweeney will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. Sweeney holds 10,165 shares of Netflix common shares. If Sweeney acknowledged that she, Netflix, or others engaged in misconduct, her investment in Netflix would be substantially devalued and her lucrative position jeopardized. Further, if Sweeney acknowledged that executives at Netflix had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company either knew of the wrongdoing or should have known of the wrongdoing.

221.    Sweeney authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

222.    Sweeney and Sarandos are trustees of the American Film Institute. Thus, Sweeney cannot consider a demand to investigate and take action against Sarandos with the required disinterest and independence.

223.    Sweeney, as a director of Netflix, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2) effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

224.    Sweeney is neither disinterested nor independent. Any demand upon Defendant Sweeney is futile and, thus, excused.

**M.      Other Factors Demonstrating That Demand Upon
The Individual Defendants Is Excused**

225.    Netflix has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

226.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

227.    Publicly traded companies, such as Netflix, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Netflix's damages.

## VII.    CLAIMS FOR RELIEF

### COUNT ONE
**Against the Individual Defendants for**
**Violations of Section 14(a) of the Exchange Act**

228.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

229.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

230.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

231.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

232.    The 2022 Proxy Statement was materially false and misleading because the Individual Defendants failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Netflix's core operations and making truthful, accurate, and complete statements to investors and customers, which resulted in the Company being named a defendant in the securities class action lawsuits; (2)

47

effectively oversee the material risks facing the Company, leading to a declining number of paid subscribers and negative financial results; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening subscriber growth and inability to meet its financial guidance.

233.    The misleading information contained in the 2022 Proxy Statement was material to Netflix's shareholders in determining whether to elect Defendants Haley, Kilgore, Masiyiwa, and Mather to the Board.

234.    The material misstatements and omissions in the 2022 Proxy Statement damaged the Company.

235.    Plaintiff, on behalf of Netflix seeks relief for damages inflicted upon the Company based on the misleading 2022 Proxy Statement in connection with the improper election of certain members of the Board.

**COUNT TWO**
**Against the Individual Defendants**
**for Breach of Fiduciary Duties**

236.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

237.    The Individual Defendants owed and owe fiduciary duties to Netflix. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Netflix the highest obligation of good faith and loyalty in the administration of Netflix's affairs, including assuring that Netflix complied with state and federal laws governing, among other things, the making of truthful, complete and accurate public statements regarding the Company's financial condition and business prospects and workplace discrimination and retaliation against employees who alleged discrimination.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Netflix alleged herein.

238.   The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

239.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of Netflix in a manner consistent with the duties imposed upon them by law.

240.   By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Netflix's affairs and in the use and preservation of Netflix's assets.

241.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Netflix has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending securities class action lawsuits.

242.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT THREE**
**Against the Individual Defendants**
**for Contribution and Indemnification**

243.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

244.   The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

245.   The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions. Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT FOUR**
**Against the Individual Defendants**
**for Aiding and Abetting**

246.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

247.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

248.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

249.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

250.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

**COUNT FIVE**
**Against the Individual Defendants**
**for Gross Mismanagement**

251.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

252.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

253.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently

managing the business of the Company in a manner consistent with the duties imposed upon them by law.

254.     During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Netflix and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

(c)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Netflix;

(d)     Declaring that the Individual Defendants have grossly mismanaged Netflix;

(e)     Directing the Company to take all necessary actions to reform and improve its internal controls and Board oversight;

(f)     Determining and awarding to Netflix the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(g)     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(h)     Awarding Netflix restitution from the Individual Defendants, and each of them;

(i)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(j)     Granting such other and further relief as the Court may deem just and proper.

IX.    **JURY DEMAND**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: September 15, 2022

**WEISS LAW**

By:    */s/ Joel E. Elkins*
Joel E. Elkins (SBN 256020)
611 Wilshire Blvd., Suite 808
Los Angeles, CA, 90017
Telephone: 310/208-2800
Facsimile: 310/209-2348

-and-

**WEISS LAW**
David C. Katz
Mark D. Smilow
Joshua M. Rubin
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212)682-3025
Facsimile: (212)682-3010
Email: dkatz@weisslawllp.com
       msmilow@weisslawllp.com
       jrubin@weisslawllp.com

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, Mindy Lehmann, hereby verify that I have held stock in Netflix, Inc. ("Netflix" or the "Company") at all times relevant hereto. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"). I am ready, willing, and able to pursue this stockholder derivative action on behalf of Netflix. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

*Mindy Lehmann*
Mindy Lehmann (Sep 13, 2022 07:58 EDT)

Mindy Lehmann